RECEIVED

APR - 9 2014

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

JAMES HEFREN                                    CIVIL ACTION NO. 12-1899

VERSUS                                          JUDGE DOHERTY

MURPHY EXPLORATION &                            MAGISTRATE JUDGE HILL
    PROD. CO., USA, ET AL.

## MEMORANDUM RULING

Pending before this Court is the "Motion for Summary Judgment" [Doc. 46] filed by

defendant McDermott, Inc. ("McDermott").   In its motion, McDermott moves for summary

judgment in its favor, arguing "the claims of Plaintiff, James Hefren, against McDermott] be

dismissed" on grounds plaintiff's claims against McDermott are perempted under La. Rev. Stat.

§9:2772. The motion is opposed by the plaintiff [Doc. 51], and McDermott has filed a "Motion for

Leave to File Reply Memorandum in Support of McDermott's Motion for Summary Judgment"

[Doc. 52], which is herein GRANTED.

For the following reasons, McDermott's motion is GRANTED, and the plaintiff's claims

against McDermott are DENIED AND DISMISSED WITH PREJUDICE

## I.    Factual and Procedural History

As set forth in a previous ruling issued by this Court, the instant litigation arises out of

personal injuries allegedly sustained by plaintiff James Hefren, an employee of Murphy Exploration

& Production Company, USA ("Murphy"), while working on Murphy's FRONT RUNNER Spar as

a lead operator.[1]  This Court adopts the undisputed facts as set forth by McDermott in its motion, except for the facts related to the issue of whether the FRONT RUNNER Spar is permanently attached to the seabed, that issue being the chiefly disputed fact for the purposes of this motion.  The undisputed facts are as follows:[2]

- On March 15, 2002, Murphy, identified as "OWNER", and McDermott, identified as "CONTRACTOR", executed the EPCI Contract for the design, engineering, procurement, construction / fabrication, installation, integration, hookup, testing, commissioning, etc. of the FRONT RUNNER Spar.  Under the EPCI Contract, McDermott agreed "to provide or arrange to have provided all engineering, design, services, personnel, labor, facilities, supervision, testing, commissioning, quality control, materials, equipment, construction equipment, etc. needed to perform and complete the WORK."

- Article 2.1 of the EPCI Contract defines "WORK" as follows:

  The WORK shall consist of the complete design, engineering, procurement, construction/fabrication, installation, integration, hookup, testing, commissioning, etc. of the FACILITY including baseline and supplemental parts as a total integrated turnkey package ready for production operations to commence, all as more fully described in this Article 2 and the CONTRACT SPECIFICATIONS, Exhibit A hereto.

- Article 1.1.1 defines "FACILITY" as the complete integrated facility described in Article 2, herein, including the Hull, Topsides, Mooring System and Riser System and all other items being designed, engineered, developed, procured, fabricated, constructed, installed, hooked-up, inspected, tested, commissioned, and made ready to commence production operations incorporating baseline and supplemental requirements pursuant to [the EPCI

---

[1] The parties dispute exactly *how* the plaintiff was injured, however they largely agree the plaintiff was injured when a flange on which he was working struck him in the head and face. Murphy contends the plaintiff was injured "when a valve flange struck him in the face," while McDermott argues the plaintiff's source of injury was "the uncontrolled release of stored pressure and hydrocarbon fluids from the flange on which he was working which struck Hefren in the head and face." *See* Murphy's memorandum, Doc. 35-1, at p. 1; *see also* McDermott's memorandum, Doc. 38, at p. 5.  The precise manner of injury is not relevant to the Court's analysis of the legal issue presented.

[2] For all citing references contained within the undisputed facts, *see* McDermott's Statement of Uncontested Facts, Doc. 46-1.

Contract]."

- Additionally, the EPCI Contract defines "SITE" to mean "the FACILITY location in Green Canyon Block 338, Gulf of Mexico."  The FACILITY referenced in the EPCI Contract is Murphy's FRONT RUNNER Spar.

- In May 2004, the FRONT RUNNER Spar was affixed to the seafloor of the outer continental shelf adjacent to the State of Louisiana.  On or about August 4, 2004, McDermott delivered the FRONT RUNNER Spar to Murphy, which accepted delivery.

- The FRONT RUNNER Spar is a platform facility that consists of a Mooring System, Hull, and Topsides.  The Topsides consists of three (3) decks (drilling, production and cellar decks) used for crew quarters, drilling, and a production facility.

- The FRONT RUNNER Spar was designed for the removal of petroleum from the seabed of CG 338.

- From the FRONT RUNNER Spar, Murphy produces oil and natural gas through eight (8) tensioned risers which carry recovered petroleum and gas from eight (8) corresponding wells to the spar.

- Additionally, recovered petroleum from three (3) other oil and gas fields (the Quatrain field located in Block 382, Green Canyon Area; the Daniel Boone field, located in Block 646, Green Canyon Area; and, the Front Runner South field, located in Block 339, Green Canyon Area) are transported to the FRONT RUNNER Spar through three (3) subsea tie backs.

- Once the FRONT RUNNER Spar receives the recovered petroleum and gas from the eight (8) wells and three (3) fields, the oil and natural gas are separated by the production equipment of the FRONT RUNNER Spar.

- Thereafter, the processed oil is transported from the FRONT RUNNER Spar to shore *via* an oil export line.

- Similarly, the processed natural gas is transported from the spar to shore *via* a gas export line.

- The FRONT RUNNER Spar is an offshore platform affixed to the sea floor in GC 338 on the OCS.  The hull is permanently ballasted and attached to its mooring system consisting of nine mooring cables attached to nine separate anchor pilings each driven approximately 220 ft. into the seabed.  The facility

-3-

is moored with a permanent, taut catenary system. The mooring is comprised of jacketed steel spiral strand wire with chain at each end. In addition to its connection to the seabed by mooring cables and piles, the facility is further secured through connection to eight tensioned risers, which carry the recovered petroleum from the wells to the SPAR facility.

- The FRONT RUNNER Spar's mooring system moors the Front Runner to the sea floor through nine (9) permanent anchors driven 220 feet into the seabed in Green Canyon Block 338 of the Gulf of Mexico and nine (9) anchor lines. The anchor lines attach the hull of the FRONT RUNNER Spar to the permanent anchors. The FRONT RUNNER Spar is further secured by eight (8) tensioned risers, which carry recovered petroleum and gas from wells to the Front Runner. Additionally, the FRONT RUNNER Spar is secured in place by three (3) subsea tie backs, which also carry recovered petroleum and gas from three (3) wells to the Front Runner.

- The FRONT RUNNER Spar platform was designed for a predicted twenty-year life span during which the Front Runner is planned to remain permanently affixed at its present site. Since its original placement on site in May 2004, the SPAR facility has not moved from the Green Canyon Block 338 location; and Murphy has no intention of moving the facility during its useful life.

- Once the FRONT RUNNER Spar was installed in Green Canyon Block 338 of the Gulf of Mexico, it could be repositioned slightly within its anchor pattern only by tightening and/or loosening its anchor lines. The process of tightening and/or loosening the FRONT RUNNER Spar's anchor lines allows the Front Runner to be repositioned slightly within its anchor pattern.

- It would take several months of planning and several additional months of work to move the FRONT RUNNER Spar outside of its anchor pattern; the FRONT RUNNER Spar would need to be deconstructed and, as a result of the time involved, could not be removed from its anchored position from the path of a hurricane or any other severe storm.

- During hurricanes Katrina, Rita, Gustav, Ike, and Isaac, the FRONT RUNNER Spar stayed on site while personnel were evacuated to shore.

The plaintiff initially filed suit against McDermott and Murphy on June 4, 2012 in the 16th Judicial District Court for the Parish of St. Mary Louisiana, asserting causes of action against both defendants for negligence [Doc. 1]. Murphy removed the matter to this Court on the basis of

-4-

OCSLA and diversity jurisdiction [Doc. 1].      On August 13, 2012, the plaintiff moved to remand the case back to state court arguing the FRONT RUNNER Spar is a vessel and, as such, his Jones Act claims were not removable.  On October 25, 2012, Magistrate Judge Hill denied the plaintiff's motion to remand, relying on, *inter alia*, *Mendez* v. *Anadarko Petroleum Corp.,* 466 Fed. Appx. 316 (5th Cir. 2012), in concluding the FRONT RUNNER Spar is not a vessel.  [Doc. 16].

On or around February 22, 2013 -- some eight and one-half years after Murphy took possession of the FRONT RUNNER Spar – a subsequent First Supplemental and Amending Complaint [Doc. 19] substituted McDermott, Inc. as a defendant in lieu of the improperly-named J. Ray McDermott Gulf Contractors, Inc.  On May 2, 2013, this Court entered summary judgment in favor of Murphy, dismissing with prejudice the plaintiff's tort claims against Murphy as barred by the exclusive remedy provisions of the Longshore & Harbor Workers' Compensation Act [Doc. 29, Memorandum Ruling].

In its complaint, the plaintiff asserts the following claims against McDermott:

## VII.

Upon information and belief, the sole cause of the subject accident was the negligence of MURPHY EXPLORATION, and [MCDERMOTT] in the following non-exclusive respects:

(1) [MCDERMOTT] in failing to properly design the subject vessel including more specifically [sic] including the valve and the application of same;

(2) [MCDERMOTT] in failing to properly construct subject vessel including more specifically the valve and the application of same;

(3) Breach of any and all applicable regulations and industry standards in regard to McDermott in the design and fabrication of the subject vessel;

(4) Failing to provide for the safety of plaintiff. . . . [3]

In briefing on the instant motion, the plaintiff clarifies that his "safety" claims against McDermott are for (1) negligent failure to identify safety hazards in the well equalizing system during the HAZOP meeting, and (2) negligent failure to provide a lookout/tagout procedure to Murphy. In the instant motion, McDermott seeks to dismiss all of the claims alleged by plaintiff against it on grounds all of the claims are perempted.

## II.    Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. Proc. 56(b). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. Fed. R. Civ. Proc. 56(e).

As the Fifth Circuit has pointed out:

> This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but

---

[3] *See* "Seaman's Petition for Damages," Doc. 1, ¶VII .

only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts*. ...[S]ummary judgment is appropriate in *any* case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations omitted)(emphasis in original).

In evaluating the evidence provided in support of, and in opposition to a Motion for Summary Judgment, "[t]he court must view facts and inferences in the light most favorable to the party opposing the motion." *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 762 (5th Cir. 2001). "A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the non-moving party." Id. In evaluating evidence to determine whether a factual dispute exists, "[c]redibility determinations are not part of the summary judgment analysis." Id. To the contrary, "[i]n reviewing all the evidence, the court must disregard all evidence favorable to the moving party *that the jury is not required to believe*, and should give credence to the evidence favoring the non-moving party, *as well as that evidence supporting the moving party that is uncontradicted and unimpeached*." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001) (emphases added).

## III.    Law and Analysis

The crux of the instant motion is whether the facility in question – the FRONT RUNNER Spar, designed and constructed by McDermott and operated by plaintiff's employer, Murphy – is properly considered an immovable under Louisiana law. If it is considered an immovable, the five-year peremptive period applies, and the plaintiff's claims against McDermott must be dismissed as perempted. In order to determine whether the FRONT RUNNER Spar is an immovable, the Court must examine the nature of the facility.

All parties to this litigation agree that OCSLA makes Louisiana law applicable to fixed offshore platforms on the outer continental shelf.[4]  Furthermore, the parties do not dispute that, under OCSLA, the surrogate law of the adjacent state to be applied in this matter is Louisiana law.  As McDermott's arguments on these points are uncontroverted by the plaintiff, this Court will assume, for the purposes of this motion, that OSCLA applies, and under OCSLA, Louisiana law applies to the plaintiff's claims against McDermott and, specifically, the issue of whether the FRONT RUNNER Spar is an immovable.

The nature of the FRONT RUNNER Spar has been discussed by this Court in previous rulings.  McDermott's contention that the Court has previously recognized the FRONT RUNNER Spar is not a vessel is accurate.  In his ruling denying the plaintiff's motion to remand, the magistrate judge held the FRONT RUNNER Spar is not a vessel [Doc. 16].  Notwithstanding the magistrate judge's ruling, in other rulings issued by this Court, this Court has not squarely addressed the precise nature of the FRONT RUNNER Spar in terms of the type of facility it is.  Rather, what has transpired is the *fact* that the FRONT RUNNER Spar is a structure permanently affixed to the sea floor and the *fact* that the FRONT RUNNER Spar is not a vessel has been included in certain parties' previously-

---

[4] OCSLA states in relevant part:

> (2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, <u>the civil and criminal laws of each adjacent State</u>, now in effect or hereafter adopted, amended, or repealed <u>are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon,</u> which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

42 U.S.C. 1333(a)(2)(A) (emphasis added).  It is well-settled that "OCSLA adopts the law of the adjacent state as surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations." *Fruge v. Parker Drilling Co.*, 337 F.3d 558, 560 (5th Cir. 2003).

filed motions for summary judgment, and those *facts* have never been disputed by the opposing party. Therefore, without specifically *ruling* on what kind of structure the FRONT RUNNER Spar actually is, this Court has assumed without deciding, for the purposes of the motions, that the FRONT RUNNER Spar is a structure permanently affixed to the seabed and not a vessel. Indeed, on May 2, 2013, this Court granted Murphy's motion for summary judgment and accepted Murphy's statement of undisputed facts, finding as follows:

- Plaintiff worked for Murphy and exclusively on the Front Runner spar platform at all times relevant to this litigation;

- At the time of his accident, Plaintiff was working for Murphy on the Front Runner spar platform as a Lead Operator;

- The Front Runner is permanently affixed to the sea floor in Green Canyon Block 338 on the Outer Continental Shelf (OCS) of the Gulf of Mexico;

- From its permanently affixed position in Green Canyon Block 338 of the OCS, the Front Runner is utilized to explore, develop, produce, and transport resources from the OCS in furtherance of Murphy's oil and gas exploration, development, production, and transportation activities;

- The Front Runner spar platform is not a vessel[.][5]

However, notwithstanding this Court's assumptions in previous rulings, this Court heretofore has noted the lack of clarity regarding the true nature of the FRONT RUNNER Spar, as follows:

*Although this Court has question as to the precise nature of the facility involved in the instant litigation* and, thus, the factual underpinnings of the application of OCSLA, as neither party disputes the nature of the facility and the application of OCSLA, this Court will assume for the purposes of this motion only that OCSLA applies in this case, and under OCSLA, Louisiana law applies to McDermott's claim for contractual indemnification. With re*spect to the application of OSCLA and the*

---

[5] *See* Memorandum Ruling dated May 2, 2013, Doc. 29, at pp. 1-2. In the motion underlying that ruling, in addition to arguing Murphy was immune from tort suits pursuant to the LHWCA, Murphy argued the plaintiff's claims against Murphy were unsustainable because the Front Runner spar platform is not a vessel, and the plaintiff is not a Jones Act seaman. The plaintiff did not oppose Murphy's motion, and this Court therefore denied and dismissed all of the plaintiff's claims against Murphy in this matter.

*precise nature of the facility in this case, this Court makes no substantive ruling regarding these entities, but rather, accepts the assumptions of the parties because the implications do not show a clear error.*[6]

It is only in the instant motion that the question of the true nature of the FRONT RUNNER Spar facility has been placed directly before the Court for adjudication.  Thus, it would be error for McDermott to rely on previous rulings of this Court as supporting McDermott's argument that the FRONT RUNNER Spar is a fixed platform.  Indeed, the issue has not been substantively considered or adjudicated, and only now has the issue been placed squarely before the Court.  All that has been decided by this Court in previous rulings is that the FRONT RUNNER Spar is <u>not a vessel</u>.

In the instant motion, McDermott argues the FRONT RUNNER Spar is an immovable fixed platform permanently affixed to the sea floor in Green Canyon Block 338 on the outer continental shelf of the Gulf of Mexico adjacent to the state of Louisiana, and as such, the plaintiff's claims against McDermott are subject to Louisiana law and are perempted under the five-year peremptive period set forth in La. Rev. Stat. §9:2772.  In response, the plaintiff argues spars are not fixed platforms but rather, are merely temporarily affixed to the seabed and are mobile.  Alternatively, the plaintiff argues even if this Court concludes the FRONT RUNNER Spar is a fixed platform – and by extension, an immovable – the plaintiff has asserted claims against McDermott that are unrelated to the design and/or construction of the facility, such that certain of the plaintiff's claims do not fall within the five-year peremption window set forth in La. Rev. Stat. §9:2772.  The Court will now consider and analyze the arguments of the parties.

### 1.      Peremption under La. Rev. Stat. §9:2772

Louisiana applies a five-year preemptive period to claims against a designer or manufacturer

---

[6] *See* Memorandum Ruling, Doc. 48, at p. 6, n.7 (emphasis added).

of an <u>immovable</u>, as follows:

A. Except as otherwise provided in this Subsection, no action, whether ex contractu, ex delicto, or otherwise, ***including but not limited to an action for failure to warn, to recover on a contract, or to recover damages, or otherwise arising out of an engagement of planning, construction, design, or building immovable or movable property which may include, without limitation, consultation, planning, designs, drawings, specification, investigation, evaluation, measuring, or administration related to any building, construction, demolition, or work***, shall be brought against any person performing or furnishing land surveying services, as such term is defined in R.S. 37:682, **including but not limited to those services preparatory to construction, or against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of *immovables, or improvement to immovable property***, including but not limited to a residential building contractor as defined in R.S. 37:2150.1:

(1)(a) **More than five years after the date of registry in the mortgage office of acceptance of the work by owner**.

(b) If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than five years after the improvement has been thus occupied by the owner.

[ . . . ]

B. (1) **The causes which are perempted within the time described above include any action**:

(a) For any deficiency in the performing or furnishing of land surveying services, as such term is defined in R.S. 37:682, **including but not limited to those preparatory to construction or in the design, planning, inspection, or observation of construction, or in the construction of any improvement to immovable property**, including but not limited to any services provided by a residential building contractor as defined in R.S. 37:2150.1(9).

(b) For damage to property, movable or immovable, arising out of any such deficiency.

(c) **For injury to the person or for wrongful death arising out of any such deficiency**.

(d) Brought against a person for the action or failure to act of his employees.

-11-

**(2) Deficiency, as used in this Section, includes failure to warn the owner of any dangerous or hazardous condition, regardless of when knowledge of the danger or hazard is obtained or should have been obtained.**

La. Rev. Stat. §9:2772 (emphasis added).

Under Louisiana law, peremption is governed by Article 3458 of the Louisiana Civil Code, which states "[p]eremption is a period of time fixed by law for the existence of a right. Unless timely exercised, the right is extinguished upon the expiration of the peremptive period." La. Civ. C. art. 3458. is a period of time fixed by law for the existence of a right. *See also Taranto v. Louisiana Citizens Property Ins. Co.*, 62 So.3d 721, 735 (La. 2011).

In explaining the difference between peremption and prescription, the Louisiana Supreme Court has explained:

> There are two distinctions between prescription and peremption: (1) the tolling of peremption extinguishes the right sought to be exercised, whereas prescription merely limits the time within which one may exercise the right; and (2) peremption is not subject to renunciation, suspension or interruption, while prescription may be renounced, suspended or interrupted. "Peremption is a period of time fixed by law for the existence of a right. Unless timely exercised, the right is extinguished upon the expiration of the peremptive period." "Statutes of peremption destroy the cause of action."

*Taranto*, 62 So.3d at 735 (internal citations omitted), *citing Guillory v. Avoyelles Ry. Co.*, 104 La. 11, 28 So. 899, 901 (La. 1900). As the Louisiana Supreme Court explained in *Guillory v. Avoyelles Ry. Co.*,

> When a statute creates a right of action, and stipulates the delay within which that right is to be executed, the delay thus fixed is not, properly speaking, one of prescription, but it is one of peremption. *Statutes of prescription simply bar the remedy. Statutes of peremption destroy the cause of action itself. That is to say, after the limit of time expires the cause of action no longer exists; it is lost.*

104 La. 11, 28 So. 899 (1900) (emphasis added).

2.     **Immovables under Louisiana law**

In order to determine whether the claims against McDermott are perempted under La. Rev. Stat. §9:2772, this Court must determine whether the structure designed and constructed by McDermott is an immovable. Under Louisiana law, an offshore platform permanently affixed to the sea floor is considered a "building" for purposes of Article 2322 of the Louisiana Civil Code, the chief codal article governing liability for damage caused by the ruin of a building. *Olsen v. Shell Oil Co.*, 365 So.2d 1285, 1289 (La. 1978). In *Olsen*, the Louisiana Supreme Court explained that, "[w]ithout further defining the limits of a "building" within the meaning of Article 2322, it is sufficient for present purposes to hold that *a permanent structure, such as the fixed drilling platform owned by Shell and which has a foundation in the soil, is indeed a building for purposes of that article, whether or not intended for habitation*." 365 So.2d at 1289 (emphasis added). The characterization of the FRONT RUNNER Spar as a "platform permanently affixed to the sea floor" – and, therefore, a building – is significant, because under Louisiana law, a building is considered an immovable. *Bruyninckx*, 554 So.2d at 248-49; *Olsen*, 365 So.2d at 1285. Ergo, Louisiana courts have expressly held a fixed drilling platform is an immovable. *See, e.g., Bruyninckx v. Bratten*, 554 So.2d 247, 248-49 (La. App. 3rd Cir. 1989), *citing Olsen, supra. See also Miller v. Slam Offshore*, 2000 WL 1210837 (E.D. La. 2000) (J. Mentz).

In *Bruyninckx*, the court specifically held La. Rev. Stat. §9:2772 invalidates claims filed against designers and contractors of fixed platforms filed beyond the period set forth in the statute, explaining:

> We are also not swayed by Bratten and Titan's argument that the Louisiana legislature did not intend that LSA-R.S. 9:2772 would apply to fixed offshore drilling platforms. No such prohibition appears in the statute. Moreover, Louisiana courts have applied general Louisiana law through the Outer Continental Shelf Act to offshore platforms,

extending LSA-C.C. Art. 2322 in Olsen, and similarly applying the Well Lien Act, LSA-R.S. 9:4861, in La. Materials Co., v. Atlantic Richfield Co., 486 So.2d 776 (La.App. 4th Cir.1986), reversed on other grounds, 493 So.2d 1141 (La.1986). Our disposition herein is in conformity with those judicial pronouncements.

In the end, Bratten and Titan, quoting Foster v. Breaux, 263 La. 1112, 270 So.2d 526 (1972), contend that where there are two permissible interpretations of a prescriptive statute, we must adopt that which favors maintaining rather than barring the action. We have strictly construed LSA-R.S. 9:2772, applying it to the fact situation herein presented and find no merit to Bratten and Titan's contention.

554 So. 2d at 249.

Plaintiff acknowledges the line of cases, cited by McDermott, holding fixed platforms in the Gulf of Mexico fall within the scope of La. Rev. Stat. §9:2772. However, without citing to any authority, the plaintiff attempts to distinguish between fixed platforms and spars, arguing "[t]technically, only the mooring system of the Front Runner [spar] is permanently attached to the seabed." The plaintiff further argues unspecified "courts" have continually recognized the platform portion of a spar is capable of being removed from the anchoring system and transported across the ocean. Thus, the plaintiff attempts to distinguish the cases cited by McDermott as cases involving traditional fixed platforms, as opposed to spars, which plaintiff argues are technically floating structures that are "merely tethered to the seabed on a temporary basis through an anchoring system," and are, therefore, not permanently attached to the sea floor.

In countering this argument, McDermott acknowledges the Fifth Circuit has yet to expressly hold that a spar is a building and/or an immovable. However, McDermott cites to several cases wherein the courts have likened spars to fixed platforms, and by extension, immovables, which have been held to be buildings under Louisiana law. One of those cases – Fields v. Pool Offshore, Inc., 182 F.3d 353, 357-59 (5th Cir. 1999) -- is particularly instructive. In Fields, the court explained:

Courts have long recognized a distinction between "work platforms" that are

-14-

designed for primarily stationary residence and true vessels. Looking to the language of the statute, we have consistently defined vessel status in reference to the importance of transportation as the craft's purpose. In particular, we have focused on three factors when trying to determine whether a structure is a work platform beyond the realm of the Jones Act. First, we ask whether the structure was constructed to serve primarily as a work platform. Second, we look to whether or not the structure was moored or otherwise secured at the time of the accident. Lastly, we attempt to ascertain whether the transportation function of the structure went beyond theoretical mobility and occasional incidental movement.

In applying the three-factor test of work-platform status to the Neptune Spar, it becomes apparent that it cannot be a vessel. As the defendants' affidavits indicated, there are no plans to even consider moving the Neptune Spar until the current field is exhausted. While nothing can ever be certain in the petroleum industry, the unchallenged prediction of defendants is that the field will remain productive for the next fifteen years. This distinguishes the Neptune Spar from the types of specialized mobile drilling craft that we have previously classified as vessels. As we have taken care to point out, while such drilling craft may stay on a particular site, they always move on to the next location when their work is done. *See Manuel*, 135 F.3d at 346 (noting that drilling vessel had been deployed at nineteen different sites over the course of two years); *Colomb v. Texaco, Inc.*, 736 F.2d 218, 221 (5th Cir.1984) ("highly mobile" submersible drilling barge was "routinely" refloated and moved to the next location). *See also Blanchard v. Engine and Gas Compressor Services, Inc.*, 575 F.2d 1140, 1143 (5th Cir.1978) (distinguishing work platform from drilling barge rigs because there was no intention to move structures "on a regular basis, as is done with submersible drilling rigs"). Unlike these vessels, the Neptune Spar is designed not only to discover and open a field, but also to exploit it—a goal that requires considerably greater commitment to a particular location. Given these undisputed facts, it would seem readily apparent that the primary, indeed only, purpose of the Neptune Spar is to serve as a work platform in a specific, fixed location for the foreseeable future.

The work platform status of the Neptune Spar is reinforced by reference to the second factor. The Neptune Spar was not only secured to the ocean floor at the time of the accident, it was secured using an elaborate system that guarantees movement will be a difficult and expensive undertaking. We are not talking about a case in which a structure merely rests on the bottom or is secured by a run-of-the-mill anchor. Here, the defendants have at presumably considerable expense sunk massive (180 foot) pilings into the ocean floor, and attached the spar to these pilings by means of similarly impressive chain lines. And like its sibling conventional fixed production platforms, the Neptune Spar is further anchored in position by the underwater infrastructure of extraction and exportation pipes that transport the petroleum from wellhead to the platform and from the platform to the shore. In this case, the infrastructure consists of two eight-inch pipelines and seven nine-and-a-half-inch

casing risers. This distinguishes it from other structures whose commitment to a particular location is less firmly evidenced by the strength of their physical attachment.

Any lingering doubt would seemingly be eradicated by examination of the third factor. While the Neptune Spar remains in its current position, it will have extremely limited and purely incidental mobility. According to the defendants' unchallenged affidavits, the Neptune Spar can be moved by tightening and slackening the chain lines connected to the pilings. This procedure is used to place the structure over one of the site's seven closely packed wellheads to perform needed work. Because of the location of the pilings, however, this movement is limited to 250 feet in any direction. This tightly-constrained range of motion is not inconsistent with work platform status. While there remains some theoretical possibility of more lengthy movement when the current field is exhausted, the mere possibility of movement so many years hence cannot render irrelevant the structure's current and long-term immobility.

Under the three-prong test of work-platform status, then, the Neptune Spar is clearly not a vessel. . . .

182 F.3d at 357-59 (certain internal citations omitted) (emphasis added). *See also Mendez v. Anadarko Petroleum Corp.*, 466 Fed. Appx. 316, *3 (5th Cir. 2012) (unpublished) (" . . . . the RED HAWK spar is not a vessel. Although the spar floats, it is permanently moored by six mooring lines that are attached to 18–foot anchors deeply embedded into the sea floor under 5,000 feet of water. The mooring lines are 78 feet long. Steel flow lines and export pipelines further attach the spar to extraction points in one direction and to an onshore production facility in Louisiana, by way of another platform, in another direction. The RED HAWK spar is permanently affixed to the sea floor and can only be moved after detaching the substantial moorings and pipelines that have been joined to its structure. The relocation study shows that moving the spar would involve detaching all the moorings and severing the pipelines; would take nearly two months; would cost of $42 million; and would require abandoning the mooring system and building a new mooring system at the new site. The relocation study shows at most that the RED HAWK is theoretically capable of maritime

transportation but not practically capable.").

In the instant case, the undisputed facts show the FRONT RUNNER Spar was designed for a twenty-year life span during which the facility is to remain permanently affixed at its present site; since its original placement in May 2004, the spar platform has not moved from the Green Canyon Block 338 location; and John James, Manager of Facilities Engineering for Murphy, has attested Murphy has no intention of moving the facility during its twenty year useful life.[7] Thus, like the Neptune Spar in *Fields*, the FRONT RUNNER Spar is designed not only to discover and open a field, but also to exploit it, and the only purpose of the FRONT RUNNER Spar is to serve as a work platform in a specific, fixed location for the foreseeable future.

Additionally, like the Neptune Spar, the uncontroverted evidence presented by McDermott shows the FRONT RUNNER Spar's mooring system provides horizontal support to keep the Spar in place; the hull is permanently ballasted and attached to its mooring system consisting of nine mooring cables attached to nine separate anchor pilings each driven approximately 220 feet into the seabed; the anchor lines attach the hull to the permanent anchors; the facility is moored with a permanent, taut catenary system; the mooring is comprised of jacketed steel spiral strand wire with chain at each end; the spar is further secured by eight tensioned risers, which carry recovered petroleum gas from wells to the spar; and the spar is secured in place by three subsea tie backs, which also carry recovered petroleum and gas from three wells to the spar.  Finally, the FRONT RUNNER Spar can be repositioned only slightly within its anchor patterns, and only by tightening and/or loosening its anchor lines.  It is undisputed it would take several months of planning and

---

[7] *See* "Declaration Made Under Penalty of Perjury Pursuant" to 28 U.S.C. §1746, attached as Exhibit "B" to the instant motion for summary judgment.

several additional months of work to move the FRONT RUNNER Spar outside its anchor pattern, and, indeed, the spar would need to be deconstructed, and as a result of the time involved, could not be removed from its anchored position from the path of a hurricane or any other severe storm. As McDermott has noted, during Hurricanes Katrina, Rita, Gustav, Ike, and Isaac, the FRONT RUNNER Spar stayed on site while personnel were evacuated to shore.

Again, this Court recognizes the issue before the Court is not whether the FRONT RUNNER Spar is or is not a vessel, that issue having already been decided.[8]  Rather, the issue is whether the spar is an *immovable*. Nevertheless, this Court finds the Fifth Circuit decisions in *Fields* and *Mendez* instructive in their characterization of spars as facilities that are *more akin to fixed platforms than vessels*. Indeed, while the plaintiff attempts to characterize the FRONT RUNNER spar as a structure that is "merely tethered to the seabed on a temporary basis through an anchoring system, the Fifth Circuit has held that structures like the FRONT RUNNER Spar "have extremely limited and purely incidental mobility," *Fields*, 182 F.3d at 359, likening such structures much more to fixed platforms – and by extension, buildings – than to vessels.

This Court acknowledges there is no definitive case holding that a spar is a building and/or an immovable. Nevertheless, after a review of the relevant jurisprudence, this Court concludes spars are akin to fixed platforms and are properly considered "buildings" as that term is used within the

---

[8] As the magistrate judge noted in his ruling denying the plaintiff's motion to remand [Doc. 16], the majority of district courts within the Fifth Circuit, including this Court, have held that a spar is not a vessel in the context of a Jones Act personal injury action. See, e.g., *Scroggs, supra*; *Moore v. Bis Salamis, Inc.*, 748 F.Supp.2d 598 (E.D. Tex. 2010); *Rushing v. Pride Intern., Inc.*, 2011 WL 3021043 (S.D. Tex. July 22, 2011); *Richardson v. Kerr-McGee Oil & Gas Corporation*, 2011 WL 2565315 (E.D. La. June 28, 2011) (Berrigan, J.); *Channel v. Grand Island Shipyard, Inc.*, 2001 WL 515220 (E.D. La. May 1, 2001); *Pupusha v. Murphy Exploration & Production Co.-USA, et al*, Docket No. 06-0549 (E.D. La. June 14, 2006) (Duvall, J.) (specifically holding that the Front Runner spar is not a vessel); *Soileau v. Nabors Offshore Company*, Docket No. 04-2334 (W.D. La. April 27, 2006) (Haik, J.) (granting summary judgment on the grounds that a spar was permanently moored and not a "vessel" within the intendment of general maritime law or the Jones Act).

Louisiana jurisprudence. This Court likens a spar to a fixed platform, and it is undisputed that, under Louisiana law, a fixed offshore oil and drilling platform is a "building." *See, e.g., Mott v. Odeco*, 577 F.2d 273, 275, *citing Moczygemba v. Danos & Curole Marine Contractors*, 561 F.2d 1149, 1151 (5th Cir. 1977); *McIlwain v. Placid Oil Co.*, 472 F.2d 248 (5th Cir. 1973), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2734, 37 L.Ed.2d 150 (1973). Other unchallenged indicia of a "building" are the fact that the FRONT RUNNER Spar is a three-story structure that is inhabited twenty-four hours a day, seven days a week; the Spar is only evacuated during major storms and hurricanes; and the Spar is equipped with crew quarters, plumbing, electric power, air conditioning and heat, and production facilities, just as a land-based building or fixed platform would be.

Considering the arguments of the parties, and the uncontroverted evidence set forth by McDermott, this Court concludes the FRONT RUNNER Spar is a building under Louisiana law. Because if is undisputed that under Louisiana law, a building is considered an immovable, this Court concludes the FRONT RUNNER Spar is an immovable within the scope of La. Rev. Stat. §9:2772.

The plaintiff goes on to argue that, if this Court concludes the FRONT RUNNER Spar is an immovable, not all of the plaintiff's claims against McDermott should be dismissed. Specifically, the plaintiff argues that, in addition to his claims against McDermott as the designer and/or contractor of the FRONT RUNNER Spar, the plaintiff has alleged additional claims – including claims for negligent failure to identify safety hazards in the well equalizing system during the HAZOP meeting, and negligent failure to provide a lookout/tagout procedure to Murphy – that are unrelated to his claims against McDermott for design and construction of the facility and are not perempted by La. Rev. Stat. §9:2772. The plaintiff's argument is without merit.

Expressly included in §9:2772 as claims that are perempted are claims for "failure to warn,"

as follows:

> A. Except as otherwise provided in this Subsection, no action, whether ex contractu, ex delicto, or otherwise, ***including but not limited to an action for failure to warn, to recover on a contract, or to recover damages, or otherwise arising out of an engagement of planning, construction, design, or building immovable or movable property which may include, without limitation, consultation, planning, designs, drawings, specification, investigation, evaluation, measuring, or administration related to any building, construction, demolition, or work,*** .
> . . .

La. Rev. Stat. §9:2772(A) (emphasis added).

Review of the plaintiff's complaint shows the essence of his claims for negligent failure to identify safety hazards in the well equalizing system during the HAZOP meeting and negligent failure to provide a lookout/tagout procedure to Murphy are a failure to warn of potential hazards of McDermott's design of the FRONT RUNNER Spar.[9] La. Rev. Stat. §9:2772 expressly provides that claims for failure to warn are within the scope of peremption.

La. Rev. Stat. §9:2772 provides that no claim relating to design or construction defects, including claims for failure to warn, may be brought against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of immovables more than five years after the date of registry in the mortgage office of acceptance of the work by owner.  According to the uncontroverted facts as set forth by McDermott, Murphy, the owner of the FRONT RUNNER Spar, took possession of the FRONT RUNNER Spar on August 4,

---

[9] Furthermore, as pointed out by McDermott, under Louisiana law, "[t]he instructions and warnings given by a manufacturer with respect to the operating capabilities of its products are a significant part of the overall design of the product." *See, e.g., LeBouef v. Goodyear Tire & Rubber Co.*, 451 F.Supp. 253, 257 (W.D. La. 1978) (J. Davis); *Reed v. John Deere*, 569 F.Supp. 371, 376 (M.D. La. 1983) (J. Parker) ("Manufacturer's instructions which accompany the product, are considered to be a part of the design of the product and the manufacturer is obligated to warn the user of potential dangers of which he is aware or could reasonably anticipate. both warnings and instructions (procedures) given by a manufacturer are considered part of the product's overall design.").

2004.  The plaintiff did not file suit against McDermott until February 22, 2013.[10]  Consequently, the plaintiff filed his claims against McDermott outside the five-year peremptive period, and his claims against McDermott are, therefore, perempted and extinguished as a matter of law.

## IV.      Conclusion

Considering the foregoing, and specifically noting this Court's conclusions that the FRONT RUNNER Spar is an immovable, and all claims asserted by the plaintiff against McDermott are perempted under La. Rev. Stat. §9:2772,

IT IS ORDERED that the "Motion for Summary Judgment" [Doc. 46] filed by defendant McDermott, Inc. is GRANTED, and the plaintiff's claims against McDermott are DENIED AND DISMISSED WITH PREJUDICE

THUS DONE AND SIGNED in Lafayette, Louisiana, this ____ day of April, 2014.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[10] Plaintiff initially brought suit against J. Ray McDermott Gulf Contractors, Inc. – a non-existent corporate entity – on June 4, 2012.  The proper McDermott entity was substituted as a party on February 22, 2013.  Nevertheless, the initial lawsuit -- even though brought against an improperly-named McDermott entity – was still filed outside the 5-year peremptive period.